**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF COLORADO**

Civil Action No. 10-CV-00046-WDM-BNB

AB INVESTMENTS, LLC,

               Plaintiff,

Vs.

ALLEN W. GELBARD, an individual,

               Defendant.

---

## FINAL PRETRIAL ORDER

---

### 1. DATE AND APPEARANCES

Fourth Final Pretrial Conference: November 17, 2011. William E. Crockett of Dion-Kindem & Crockett appeared telephonically on behalf of the Plaintiff, AB Investments, LLC ("ABI"), Defendant Allen Gelbard ("Gelbard") appeared telephonically on his own behalf.

### 2. JURISDICTION

This Court has jurisdiction over this matter under 28 U.S.C. § 1332 in that there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs. There is complete diversity of citizenship between ABI, a Colorado resident and Gelbard, a California resident.

### 3.  CLAIMS AND DEFENSES

**<u>PLAINTIFF</u>**

<u>First Cause of Action</u>:

1.     Burden of Proof: Plaintiff

       Stipulation: _____

2.     Standard of Proof: Preponderance of the Evidence

       Stipulation: _____

3.     State Law: Colorado

       Stipulation: _____

4.     Elements:

       a.  Contract:

            i.  Gelbard (a member of ABI during 2000-2005 (Exh. 1)) and

               ABI entered into an oral contract in 2000.  The terms of the

               oral contract are:  ABI agreed to lend money to Gelbard in such

               amounts as requested by Gelbard from time to time.  Gelbard

               agreed to repay the money upon demand and pay interest at 7%

               per annum.

            Testimony: Robert Beaton and/or Rodney Unger

            Exhibits: 1-9, 22

            Stipulation: _____

ii.   Gelbard borrowed from ABI the sum of $640,186 in 2000, of

which $580,186 remains unpaid.

Testimony: Robert Beaton and/or Rodney Unger

Exhibits 4, 5, 22

Stipulation: _____

iii.   Gelbard borrowed from ABI the sum of $616,876 in 2001.

Testimony: Robert Beaton and/or Rodney Unger

Exhibit 5, 22

Stipulation: _____

iv.   Gelbard borrowed from ABI the sum of $269,534 in 2002.

Testimony: Robert Beaton and/or Rodney Unger

Exhibit 6, 22

Stipulation: _____

v.   Gelbard borrowed from ABI the sum of $625,370 in 2003.

Testimony: Robert Beaton and/or Rodney Unger

Exhibit 7, 22

Stipulation: _____

vi.   Gelbard borrowed from ABI the sum of $283,250 in 2004.

Testimony: Robert Beaton and/or Rodney Unger

Exhibit 8, 22

Stipulation: _____

vii.   Gelbard borrowed from ABI the sum of $301,725 in 2005.

Testimony: Robert Beaton and/or Rodney Unger

Exhibit 9, 22

Stipulation: _____

viii.  Gelbard borrowed from ABI the total principal sum of $2,676,941 during the years 2000 through 2005.  Accrued interest at 7% per annum through November 1, 2011 is $1,681,828.

Testimony: Robert Beaton and/or Rodney Unger

Exhibits: 2-9, 22.

Stipulation: _____

b.  Gelbard repeatedly admitted from 2003 to 2005 that he owed a debt to ABI.

Testimony: Robert Beaton or Rodney Unger

Exhibits: 2, 3, 10, 11, 13

Stipulation: _____

c.  ABI made demand on Gelbard for repayment of the loan in 2005 and 2010.

Testimony: Robert Beaton or Rodney Unger

Stipulation: _____

d.  Breach of contract: Gelbard has not repaid the debt.

Testimony: Robert Beaton or Rodney Unger

Stipulation: _____

e.   Gelbard filed for Chapter 7 bankruptcy on October 14, 2005.

Testimony: Robert Beaton or Rodney Unger

Exhibit 12

Stipulation: _____

f.   Gelbard's bankruptcy case was dismissed on January 8, 2010.

Testimony: Robert Beaton or Rodney Unger

Exhibit 15

Stipulation: _____

g.   This lawsuit was filed immediately after dismissal of the bankruptcy
on January 8, 2010.

Testimony: Robert Beaton or Rodney Unger

Exhibit 21

Stipulation: _____

**<u>DEFENDANT</u>**

Defendant Gelbard contends the following regarding the First Cause of Action:

Gelbard requests that these two claims be dismissed with prejudice,
because ABI has no evidence to support these claims. Defendant contends that
Plaintiff has not presented any evidence in some seven lawsuits in five
jurisdictions in the last three years. Defendant contends Mr. Gelbard was able to

obtain incontrovertible accounting evidence from the bankruptcy trustee in the form of a series of Excel Spreadsheets on a computer disc produced by Plaintiffs and prepared by Unger, that was analyzed by a forensic accountant who opined that the Plaintiffs falsified the ABI accounting and defrauded Gelbard, by repeatedly and systematically manipulating the accounting and "cooking the books" of ABI. Defendant contends Gelbard believes that these causes of action were brought against him in bad faith and should be dismissed with prejudice, so that Plaintiff is precluded from continuing his unfounded harassment and abuse of process in yet another forum in the future.

Defendant Gelbard further contends the following:

1.     By his First Affirmative Defense, Gelbard alleges that in or about 2009, Rodney Unger ("Unger"), who purports to have become a partner in ABI in 2004, acting for himself or on behalf of ABI, purchased Gelbard's one-third interest in ABI, in Gelbard's bankruptcy, which purchase included the value of Gelbard's share of the assets of ABI subject to any and all liabilities owed to ABI or claims against Gelbard by ABI, including without limitation the claim by ABI, albeit false, that Gelbard "borrowed" $2.6 million from ABI prior to October of 2005 and is somehow obligated to repay that sum.  Thus, the proper Defendant here is Rodney Unger.

2.     By his Second Affirmative Defense, Gelbard alleges that ABI has not suffered any damages due to any act of Gelbard, no money was ever loaned to Gelbard by ABI, there was no agreement ever to repay any monies claimed to be

"loans," and to the extent that monies were distributed to Gelbard, they constituted only a small fraction of what should have been his share of the profits of ABI, and the amount of any such monies distributed to Gelbard as his share of the profits of ABI, pales in comparison to the $150,000,000 that was taken, stolen, misappropriated, diverted and/or converted, by Robert Beaton ("Beaton"), according to his own sworn testimony, either separately or in concert with Unger. In addition, in 1999, Beaton fraudulently induced Gelbard to contribute an additional $4.5 million of Gelbard's separate assets to ABI, by making false claims regarding ABI's cash flow and promising Gelbard that this amount would be credited to Gelbard's ABI capital account. No such credit was ever applied, as is verified by ABI's aforementioned Excel Spreadsheet.  If Gelbard's capital account had been properly credited with the $4.5 million in assets he contributed to ABI, let alone the $75 million that was Gelbard's one half share of the some $150 million that was stolen from ABI, Gelbard would have had a positive capital account of nearly $2.0 million in October 2005, rather than the $2.6 million negative capital account, as asserted by Beaton and Unger in 2005 and later purportedly "confirmed" by Howard Bernstein ("Bernstein") and Michael Littman ("Littman"), which, not coincidentally, is exactly the debt alleged by ABI in its first claim for relief in this proceeding.  Thus, Gelbard owes nothing to ABI.

     3.     By his Third Affirmative Defense, Gelbard alleges that all of the events and circumstances alleged here, took place in California, and Gelbard is a resident of California and has never conducted business in Colorado.  Therefore,

venue is not proper in this District.

4.    By his Fourth Affirmative Defense, Gelbard alleges that all of the events and circumstances alleged here, took place in California, and Gelbard is a resident of California and has never conducted business in Colorado.   Therefore, both personal and subject matter jurisdiction are not proper in this District.

5.    By his Fifth Affirmative Defense, Gelbard alleges that to the extent that any monies were owed to ABI by Gelbard, which he vehemently denies, the claim of ABI was fixed by October 2005, and was set forth on Gelbard's bankruptcy schedules, based on the specific and false representations of Beaton, Unger and Bernstein that $2.6 million was owed by Gelbard and that Gelbard had to schedule that debt so that ABI could write off the debt on its tax returns (which ABI did), which representations have now been determined by Gelbard to be a part of the fraudulent scheme perpetrated on Gelbard by Beaton, Unger, Bernstein, ABI and others, beginning in or about 1998 and continuing through the present day, all as has been set forth at greater length in the original Complaint filed by Gelbard and Lisa Du Boise in Los Angeles Superior Court in January 2010, entitled *Gelbard and Du Boise v. Unger, Beaton et al.*, Case No. LC088263.   Although the statute of limitations may have been stayed by Gelbard's bankruptcy, the stay was lifted by the entry of Gelbard's discharge. When the cumulative time is calculated, from before the bankruptcy filing and after the discharge, any alleged claim against Gelbard by ABI is barred by the applicable statute of limitations for contract actions in Colorado.

6.      By his Sixth Affirmative Defense, Gelbard alleges that Beaton and Unger agreed and consented to the distributions of monies to Gelbard as his share of the profits of ABI (in reality, only a minute fraction of Gelbard's share), and that there never was any agreement that these monies were "borrowed" and had to be "repaid."  In fact, Beaton, Unger and Bernstein affirmatively represented to Gelbard that $2.6 million was owed by Gelbard and that Gelbard had to schedule that debt so that ABI could write off the debt on its tax returns, which representations have now been determined by Gelbard to be a part of the fraudulent scheme perpetrated on Gelbard by Beaton, Unger, Bernstein, ABI and others, beginning in or about 1998 and continuing through the present day, all as has been set forth at greater length in the original Complaint filed by Gelbard and Lisa Du Boise in Los Angeles Superior Court in January 2010, entitled *Gelbard and Du Boise v. Unger, Beaton et al.*, Case No. LC088263.  Thus, having consented to the distribution of monies to Gelbard, as a partner in ABI, and having written off the debt on ABI's tax returns, ABI has waived its claim against Gelbard and is not entitled to recover anything by this claim against Gelbard.

7.      By his Seventh Affirmative Defense, Gelbard alleges that Beaton and Unger ratified the distributions of monies to Gelbard as his share of the profits of ABI, and that there never was any agreement that these monies were "borrowed" and had to be "repaid."  In fact, Beaton, Unger and Bernstein affirmatively represented to Gelbard that $2.6 million was owed by Gelbard and that Gelbard had to schedule that debt so that ABI could write off the debt on its

tax returns, which representations have now been determined by Gelbard to be a part of the fraudulent scheme perpetrated on Gelbard by Beaton, Unger, Bernstein, ABI and others, beginning in or about 1998 and continuing through the present day, all as has been set forth at greater length in the original Complaint filed by Gelbard and Lisa Du Boise in Los Angeles Superior Court in January 2010, entitled *Gelbard and Du Boise v. Unger, Beaton et al.*, Case No. LC088263. Thus, having ratified the distribution of monies to Gelbard, as a partner in ABI, and having written off the debt on ABI's tax returns, ABI has waived its claim and is not entitled to recover anything by this claim against Gelbard.

8. By his Eighth Affirmative Defense, Gelbard alleges that Beaton breached the Operating Agreement of ABI <u>before</u> that Agreement had even been signed, by making undisclosed, illegal and fraudulent transfers of some of the restricted S8 securities beneficially owned by ABI, to various persons and entities, including without limitation Nathan Drage, Adrian Wilson, Lester Mower and Eva Mower, who were all subsequently indicted based on Beaton's transfers of cash and stock belonging to ABI and other similar fraud, in June of 2008. According to the partial accounting that Gelbard and Du Boise have been able to piece together from various lawsuits and SEC investigations, and will present at trial, Gelbard is informed and believes, and based thereon alleges, that this scheme engaged in by Beaton and his co-conspirators, over a period of years, not only generated over $150 million in fraudulent profits for them, but to conceal

their illegal stock trading and manipulation, very few, if any taxes were paid by Beaton and his co-conspirators, thereby constituting tax fraud.  To the extent that any monies were "loaned" to Gelbard, which he denies, the amount of any such monies distributed to Gelbard as his share of the profits of ABI, pales in comparison to the $150,000,000 that was taken, stolen, misappropriated, diverted and/or converted, by Robert Beaton ("Beaton"), either separately or in concert with Unger.  In addition, in 1999, Beaton fraudulently induced Gelbard to contribute $4.5 million in additional separate assets belonging to Gelbard, to ABI, promising Gelbard that that amount would be credited to Gelbard's capital account, but no such credit was ever applied.  If Gelbard's capital account had been properly credited with the $4.5 million in assets he contributed to ABI, Gelbard would have had a <u>positive</u> capital account of nearly $2.0 million in October 2005 (not considering the stolen $75 million that belonged to Gelbard as his one-half share), rather than the $2.6 million <u>negative</u> capital account, as asserted by Beaton and Unger in 2005 and later purportedly "confirmed" by Bernstein and Littman, which, not coincidentally, is exactly the debt claimed by ABI in its first claim for relief in this proceeding.  Thus, as a result of the fraudulent and/or negligent conduct of Beaton, all of which was ratified by Unger, Gelbard owes nothing to ABI.

9.     By his Ninth Affirmative Defense, Gelbard alleges that as a partner of ABI, he was absolutely entitled to receive distributions of profits from ABI, and therefore, and distribution of such funds was justified.  To the extent that

Beaton, Unger and Bernstein represented to Gelbard that Gelbard must file for personal bankruptcy and that if Gelbard scheduled the alleged debt to ABI on his bankruptcy schedules, ABI would write off the claim as a bad debt, which ABI did. In addition, as a result of Beaton's breach of the ABI Operating Agreement, Gelbard was excused from any further performance under the agreement. *Morris v. Belfor USA Group, Inc.* 201 P.3d 1253, 1258 (Colo. Ct. App. 2008). Therefore, any alleged debt owed by Gelbard to ABI was written off and/or otherwise excused, or it was assumed by Unger when he purchased Gelbard's interest in ABI from the bankruptcy trustee.

10.     By his Tenth Affirmative Defense, Gelbard alleges that while he was a partner of ABI, he fully performed, satisfied and discharged his duties as a partner, for which he was absolutely entitled to receive distributions of profits from ABI. In addition, in 1999, Beaton fraudulently induced Gelbard to contribute $4.5 million in additional separate assets belonging to Gelbard, to ABI, promising Gelbard that that amount would be credited to Gelbard's capital account, but no such credit was ever applied, according to ABI's own accounting. If Gelbard's capital account had been properly credited with the $4.5 million in assets he contributed to ABI (not to mention the stolen $75 million that belonged to Gelbard as his one-half share), Gelbard would have had a <u>positive</u> capital account of nearly $2.0 million in October 2005, rather than the $2.6 million <u>negative</u> capital account, as asserted by Beaton and Unger in 2005 and later purportedly "confirmed" by Bernstein and Littman, which, not coincidentally, is

exactly the debt claimed by ABI in its first claim for relief in this proceeding. Therefore, no amount is due and owing by Gelbard to ABI.

11.     By his Eleventh Affirmative Defense, Gelbard alleges that Beaton breached the Operating Agreement of ABI before that Agreement had even been signed, by making undisclosed, illegal and fraudulent transfers of some of the restricted S8 securities beneficially owned by ABI, to various persons and entities, including without limitation Nathan Drage, Adrian Wilson, Lester Mower and Eva Mower, all subsequently indicted for these and other similar crimes. According to the partial accounting that Gelbard and Du Boise have been able to piece together from various lawsuits and SEC investigations, and will present at trial, Gelbard is informed and believes, and based thereon alleges, that this scheme engaged in by Beaton and his co-conspirators, over a period of years, not only generated over $150 million in fraudulent profits for them, but to conceal their illegal stock trading and manipulation, very few, if any taxes were paid by Beaton and his co-conspirators, thereby constituting tax fraud. At the time that Unger purported to become a partner in ABI, revised and amended prior tax returns and prepared current and future tax returns, so as to conceal Beaton's fraudulent conduct, and by doing so, Unger ratified such fraudulent conduct. In addition, in 1999, Beaton fraudulently induced Gelbard to contribute $4.5 million in additional separate assets belonging to Gelbard, to ABI, promising Gelbard that that amount would be credited to Gelbard's capital account, but no such credit was ever applied.  If Gelbard's capital account had been properly credited with

the $4.5 million in assets he contributed to ABI (not considering the stolen $75 million that belonged to Gelbard as his one-half share), Gelbard would have had a positive capital account of nearly $2.0 million in October 2005, rather than the $2.6 million negative capital account, as asserted by Beaton and Unger in 2005 and later purportedly "confirmed" by Howard Bernstein ("Bernstein") and Michael Littman ("Littman"), which, not coincidentally, is exactly the debt claimed by ABI in its first claim for relief in this proceeding. Thus, ABI and its remaining partners are guilty of unclean hands, and any claim that monies were "loaned" to Gelbard, which he denies, and that he was obligated to repay such "loans," is barred by the equitable doctrine of unclean hands. Additionally, any money to which ABI had access, was embezzled and misappropriated by Beaton and Unger from Gelbard, and came from Gelbard's stolen stock, warrants, cash, and real estate.

12.     By his Twelfth Affirmative Defense, Gelbard alleges that the distribution of Gelbard's share of the profits to Gelbard occurred over a period of years, and to the extent that ABI alleges that these monies were "loaned" to Gelbard and that he was obligated to "repay" those monies, ABI failed to assert its alleged right to "repayment" until January 8, 2010.  As a result, ABI failed to mitigate its damages, and any right to claim that monies are now owed to ABI, is therefore barred.

13.     By his Thirteenth Affirmative Defense, Gelbard alleges that the distribution of Gelbard's share of the profits to Gelbard occurred over a period of

years, and to the extent that ABI forced Gelbard into bankruptcy and forced him to schedule this alleged debt to ABI, so as to allow ABI to write off this alleged debt, ABI is now estopped to claim that any monies are owed to ABI by Gelbard, by the doctrines of equitable estoppel and judicial estoppel.

14.    By his Fourteenth Affirmative Defense, Gelbard alleges that Beaton and Unger ratified the distributions of monies to Gelbard as his share of the profits of ABI, and that there never was any agreement that these monies were "borrowed" and had to be "repaid."   In fact, Beaton, Unger and Bernstein affirmatively represented to Gelbard that $2.6 million was owed by Gelbard and that Gelbard had to schedule that debt so that ABI could write off the debt on its tax returns, which representations have now been determined by Gelbard to be a part of the fraudulent scheme perpetrated on Gelbard by Beaton, Unger, Bernstein, ABI and others, beginning in or about 1999 and continuing through the present day, all as has been set forth at greater length in the original Complaint filed by Gelbard and Lisa Du Boise in Los Angeles Superior Court in January 2010, entitled *Gelbard and Du Boise v. Unger, Beaton et al.*, Case No. LC088263.   Thus, having ratified the distribution of monies to Gelbard, as a partner in ABI, and having written off the debt on ABI's tax returns, ABI has waived its claim against Gelbard and is not entitled to recover anything by this claim against Gelbard. Additionally, any money to which ABI had access, was embezzled and misappropriated by Beaton and Unger from Gelbard, and came from Gelbard's stolen stock, warrants, cash, and real estate.

15.     By his Fifteenth Affirmative Defense, Gelbard alleges that to the extent that any monies were owed to ABI by Gelbard, which he adamantly denies, the claim of ABI was fixed by at least October 2005, and was set forth on Gelbard's bankruptcy schedules, based on the specific representations of Beaton, Unger and Bernstein that $2.6 million was owed by Gelbard and that Gelbard had to schedule that debt so that ABI could write off the debt on its tax returns, which representations have now been determined by Gelbard to be a part of the fraudulent scheme perpetrated on Gelbard by Beaton, Unger, Bernstein, ABI and others, beginning in or about 1999 and continuing through the present day, all as has been set forth at greater length in the original Complaint filed by Gelbard and Lisa Du Boise in Los Angeles Superior Court in January 2010, entitled *Gelbard and Du Boise v. Unger, Beaton et al.*, Case No. LC088263.   Thus, prior to October 2005, ABI should have filed an action against Gelbard, if it believed that it had a claim against him, and even after Gelbard filed bankruptcy in October 2005, ABI should have filed an Adversary Proceeding against him. Thus, because ABI waited until January 8, 2010, to first assert this claim against Gelbard, any alleged claim by ABI against Gelbard is barred by the equitable doctrine of laches.

16.     By his Sixteenth Affirmative Defense, Gelbard alleges that to the extent that any monies were owed to ABI by Gelbard, which he vehemently denies, any alleged damages that are claimed to have been suffered, would have been actually suffered by the partners of ABI and not by the entity itself.

Accordingly, ABI lacks standing to have asserted this claim against Gelbard.

To the extent that ABI claims that Gelbard is barred from introducing documentary evidence in support of his affirmative defenses, as a result of an alleged failure to provide such documents in discovery, Defendant contends and Plaintiff denies that Gelbard offered to allow inspection of his documents in California, which offer was never accepted by ABI.  Moreover, Defendant contends many of the documents to be introduced at trial by Gelbard are documents originally prepared by ABI and/or are documents and other information produced to Gelbard by ABI and/or were provided to ABI and Unger in Gelbard's bankruptcy and other litigation matters between the parties, including without limitation produced in the action entitled *Unger v. Du Boise* that was tried in Federal Court in March 2010, in which Unger claimed that Du Boise was required to "repay" $1.3 million that Unger allegedly "loaned" to Du Boise.  In less than an hour, a jury returned a complete defense verdict, finding that Unger was simply not credible and that nothing was in fact owed by Du Boise to Unger.  Further, there is no discovery order here precluding Gelbard from producing documentary evidence to support his defenses.

## 4.  STIPULATIONS

None.

## 5.  PENDING MOTIONS

None.

**6.  WITNESSES**

Plaintiff's non-expert witnesses:

  a.   Robert Beaton, member of ABI. Testimony on the issues set forth above;

  b.   Rodney Unger, member of ABI. Testimony on the issues set forth above;

  c.   Defendant Allen Gelbard. Testimony to include facts surrounding the formation and terms of the underlying contract and Gelbard's failure to repay, thereby breaching said contract.

  Witnesses who may be present at trial if the need arises: for ABI: Howard O. Bernstein, ABI's former accountant, may testify concerning ABI's tax records and the preparation thereof.

  Witnesses where testimony is expected to be presented by means of a deposition and, if not taken stenographically, a transcript of the pertinent portions of the deposition testimony:  None.

B. Expert Witnesses

 1) Experts who will be present at trial:  None.

 2) Experts who may be present at trial if the need arises: for Plaintiff as to ABI tax records, Howard O. Bernstein.  Mr. Bernstein may also testify as a percipient witness.

 3) Expert witnesses where testimony is expected to be presented by means of a deposition and, if not taken stenographically, a transcript of the pertinent portions of the deposition testimony: None.

Defendant's Witnesses

A. Non-Expert Witnesses

1) Lisa Du Boise.  Testimony will include facts that the alleged monies, if any, provided to Gelbard by ABI, were distributions as his share of ABI's profits and that no "loans' were ever made and there was never any agreement to "repay" any amounts to ABI.  Du Boise is also expected to testify regarding the maintenance and improvement of the Ranch on Cornell Road in Agoura, with monies constituting Gelbard's distributions, and that Unger was unjustly enriched when he fraudulently evicted Du Boise and Gelbard from the Ranch in 2008, and then stole all of the personal property that remained at the ranch that belonged to Gelbard, Du Boise and a host of other individuals.

2) Jack Du Boise. Mr. Du Boise will testify regarding the condition of the Horse Ranch in 2005, and the efforts of Gelbard and Du Boise to maintain, repair and improve the Ranch from 2005 through 2008.

B. Defendant's Expert Witnesses

1) Coral Hansen.  Ms. Hansen is a Certified Public Accountant in California and is also Certified in Fraud Forensics (CFF).  She will testify that the books and records and other financial records of ABI are in disarray, are incomplete, are potentially inaccurate, and that many of the entries cannot be verified with other documentation.  Additionally, Ms. Hansen will testify that ABI's books and records appear to have been recreated, restated and/or revised, and that there are no proper details included about the transactions prior to 2000.  Further, Ms. Hansen will testify that there is no supporting detail for any journal entries listed throughout the Excel Workbook document to enable an analysis of its true nature or accuracy, that some of the entries in ABI's books and records are inconsistent

or contradictory, and that considering the state of ABI's books and records, it is very difficult if not impossible, to compile a complete and accurate picture of the financial transactions of ABI, except that to state that Gelbard was defrauded of many, many millions of dollars.

2) Aaron Grunfeld, Esq., may testify as to securities matters.

## 7. EXHIBITS

A separate exhibit list containing Plaintiff's exhibits is submitted with this Order.

1)   ABI requests, or will request at trial, that the Court take judicial notice of the following exhibits: 10-18, 21

### A. Gelbard's Exhibits:

17. Transcripts of the Depositions of Beaton taken by the Securities and Exchange Commission ("SEC") in 1999 and taken by counsel for USA Talks.com, Inc. ("USAT") in 2006, including without limitation pages 320-24 of Volume II and pp. 870-83 of Volume V of Beaton's USAT Deposition;

18.        The USAT stock distribution chart submitted as Exhibit 7 to the 5th Amended Complaint in the lawsuit entitled *USAT Talks.com v. Mark Moskowitz, et al*, L. A. Superior Court Case No. BC 259794 (the "USAT Action"), as previously produced in Gelbard's bankruptcy and in the Los Angeles Superior Court Action entitled *Gelbard v. Unger et al.*;

19.        Bank statements and parts of the historic capital account ledgers for ABI, primarily from 1999 and 2000, including the General Ledger dated "As of December 31,

1999," along with other accounting records and financial documents for ABI, mostly from the period between 1999 and 2001, which show the payments made by Gelbard to purchase the horse ranch property in Agoura (the "Horse Ranch");

20.        Tax returns for ABI, primarily for the years 1998 through 2006;

21.        Portions of ABI books and records that were maintained on an Excel Workbook;

22.        A letter from ABI accountant Morris Engel, to Beaton dated 5-2-99;

23.        A letter from ABI accountant Morris Engel to McDermott, Will and Emory tax attorney Elizabeth Mann, dated August 16, 1999, regarding "Allen Gelbard and Robert Beaton shares held in USA Talks.com, Inc. ("USAT");"

24.        A Letter of Agreement dated June 12, 2003, ostensibly between ABI and Manatee Design Group, Inc., a Nevada corporation with Rodney Unger (as its principal shareholder);

25.        The Settlement Agreement in the USAT lawsuit, entered into on May 23, 2007 by and between the ABI Defendants, Unger, Beaton and USAT;

26.        Records of the contributions made to ABI at the time of its formation, by Beaton and Gelbard;

27.        Records of Beaton's payments to Mr. Gelbard, which Beaton claims were loans by him to Mr. Gelbard, in 1998 and 1999;

28.        Records related to the Horse Ranch, including the notation of $1.86 million paid from ABI and debited to Gelbard's capital account and the Grant Deed by

which the Horse Ranch was conveyed to Unger in November of 2004, as a "gift for no consideration;"

29.         The Operating Agreement of ABI executed by and between Beaton and Gelbard on August 1, 1998;

30.         The Amendment and Joinder to Operating Agreement of ABI dated March 18, 2004, regarding the basis for Unger's partnership interest in ABI;

31.         A letter from ABI attorney Michael Littman, dated March 10, 2008, as attorney for Unger and  Beaton, regarding Unger's financing and refinancing of the Horse Ranch, Littman's valuation of the Horse Ranch at $8.0 million and ABI's alleged ownership of stock in Regal One and Neuralstem;

32.         Portions of the transcript of Unger's Deposition in the USAT case, taken in October of 2006, and particularly at pp. 45-59 and 94-99, in which Unger admitted that he did not own the Horse Ranch when he represented to the court in the unlawful detainer action that he was the owner, in order to unlawfully evict Gelbard and Du Boise from that property, in October 2008;

33.         A handwritten memorandum dated October 22, 2000 from Morris Engel, the accountant for ABI, to Gelbard, Beaton and Aaron Grunfeld, with a subject line reading  "Structure of AB Investment, LLC;"

34.         SEC Form 10-KSB for Regal One Corporation for the year ended December 31, 2004, reflecting the trading price of its stock at that time, which was $.64 per share and sets the value of ABI's stock position in Regal One as of the end of 2004, at approximately $2,331,000, based on its alleged ownership of 3,641,500 shares (3,641,500

x $0.64) and establishes Gelbard's share at approximately $777,000, based on his one-third ownership interest in ABI ($2,331,000 x 33.3%);

35.     The Writer's Guild Proof of Claim in the amount of $178,106.83 that was filed in Gelbard's bankruptcy, dated August 16, 2007;

36.     The SB-2/A SEC filing of Intelliquis International Inc. filed on September 28, 2000, in which Intelliquis disclosed that:  "On September 11, 2000, an action was commenced by us against certain of our shareholders, including former officers and attorneys of Intelliquis International, Inc., in the United States District Court for the District of Utah, Central Division, in a matter entitled *Intelliquis International, Inc. v. Robert M. Beaton, et al.*, case number 2:00CV00703;

37.     The 11-count Indictment issued on June 30, 2009, by a Federal Grand Jury, charging Drage, Adrian Wilson and Lester Mower and Eva Mower, all of whom are close associates of Beaton, with conspiring to conceal from the IRS, the profits stemming from their illicit mergers and acquisition "business" and with under-reporting or not reporting income over a span of approximately seven years;

38.     The Grand Jury Subpoena issued on June 3, 2008, and thereafter served upon Gelbard, seeking his knowledge and testimony regarding the fraudulent activities of Beaton, Unger and their associates, based on Gelbard's discussions with federal prosecutors;

39.     The chart entitled "ABI Connectivity to Indictees and Entities," prepared by plaintiff's counsel in the USAT Action, filed against ABI, Beaton, Unger, Gelbard and

others, which details and documents the network of individuals and entities with whom Beaton was involved and to whom he illegally transferred USAT shares;

40.        Bank statements for ABI showing transfers to and from entities listed in the subpoena served on Gelbard and the Indictment against Drage, Wilson and the Mowers, in amounts from $50,000 to $1.3 million, including: Drage, A-Business Funding (Mowers), Capital Services International (Drage, Wilson, Mowers), Gene Hochevar ("Hochevar"), and DHM Enterprises, LLC (Drage, Hochevar, Mowers);

41.        ABI's capital account ledgers dated August 31, 2000 and October 31, 2000, which evidence Beaton's and Unger's fraud, with well over $2 million in false entries on only the first page alone of the ledger;

42.        A document entitled "INFORMATION REQUIRED TO COMPLETE 1998 INCOME TAX RETURNS OF ROBERT BEATON," authored by ABI accountant Morris Engel ("Engel") of Engel, Kalvin, McMillan & Kipper, LLP, with a fax signature date of 5-2-1999, which evidences how Beaton took 100% of the proceeds from his illegal sales of ABI's 1998 USAT stock and charged all of the taxes on what he had diverted, converted and stolen, to ABI and Gelbard, which forced Gelbard to pay taxes on income he never received;

43.        The mortgage statement obtained by Unger, evidencing that he borrowed $3,774,673.66, from American Home Servicing, using Gelbard's Horse Ranch as security;

44.        A dated October 15, 2008, entitled "*Unger v. Gelbard*, Civil Code Section 1965 *Property Demand,*" which establishes that Gelbard and Du Boise complied with the

provisions of Civil Code § 1965 and Code of Civil Procedure § 1174, by making a written demand for the return of their personal property, including 59 firearms, when they were unlawfully evicted from the Horse Ranch in October 2008;

45.       An article from the internet dated June 24, 2011, evidencing a recent $10,000,000 malpractice verdict in Los Angeles Superior Court against Unger's and ABI's lawyers in Los Angeles, Rosslyn Hummer and the law firm, Rutter, Hobbs & Davidoff, Inc.;

46.       The Complaint filed by Unger in Gelbard's bankruptcy, in 2008, by which Unger unsuccessfully sought to revoke Gelbard's discharge.

47.       Gelbard's Amended Bankruptcy Schedules, filed on December 18, 2009, in which he disclosed his interest in the $7.5 million Horse Ranch, as soon as he discovered that he had been lied to in 2005, 2006 and 2007, by Unger, Beaton and others;

48.       ABI's Balance Sheet as of December 31, 2007, showing a "Rental Income Receivable" from Gelbard in the amount of $720,000, which reflects ABI's claim to rent from Gelbard for <u>ABI's</u> ownership of the Ranch, that Unger falsely claimed to own in the unlawful detainer action;

49.       The Complaint filed by Unger on August 4, 2008, in an action entitled *Unger v. Du Boise*, U.S.D.C. Case No. CV08-05097-RGK (PLAx), by which he asserted five claims against Ms. Du Boise, three of which were dismissed before trial for having been filed and prosecuted by Unger and his attorneys without probable cause and two of which were tried and decided in favor of Ms. Du Boise in March 2010;

50.       The Special Verdict rendered in the federal court action tried to a jury in

March 2010, entitled *Unger v. Du Boise*, in which the jury returned in an hour with a complete defense verdict, on the remaining two claims brought to trial by Unger that Ms. Du Boise owed him $1,300,000 plus interest and punitive damages, based on determinations that Unger was not credible and that he had no right to possess the $1.3 million that he claimed to have "loaned" to Ms. Du Boise;

51.        The Judgment in favor of Lisa Du Boise, in the federal court action tried to a jury in March 2010, entitled *Unger v. Du Boise*, showing that Unger recovered nothing on his claims that Ms. Du Boise owed him $1,300,000 plus interest and punitive damages;

52.        The Notice of Trustee's Sale for the Horse Ranch, showing that Unger was in default under the loan he obtained that was secured by the Horse Ranch and setting the sale for September 29, 2010; portions of the Horse Ranch was ultimately foreclosed upon by the lender when Unger refused to make payments on the $3.7 million loan he obtained secured by the Horse Ranch, while Unger retained other portions of the Horse Ranch;

53.        The Independent Accountant's Report and Personal Property Inventory, prepared by accountants hired by Unger, Hummer and Peterson at the time of the eviction of Gelbard and Ms. Du Boise from the Horse Ranch in mid-October 2008, listing the tens of thousands of dollars worth of personal property belonging to Gelbard, Ms. Du Boise and others, that was located at the Horse Ranch at the time of the unlawful eviction of Gelbard and Ms. Du Boise, most of which was stolen and converted by Unger, Hummer and Peterson, in the exact form as these documents were filed by Unger, Hummer and

Peterson in the Adversary Proceeding they filed against Gelbard, in his bankruptcy, by which they unsuccessfully sought to revoke Gelbard's discharge; the last two pages of this inventory list more than 50 firearms that were located at the Horse Ranch at the time of the eviction of Gelbard and Du Boise, most of which firearms were unlawfully seized by Hummer and unlawfully turned over to a firearms dealer and to the Sheriff's Department;

54.      The Declaration of Rosslyn Hummer executed on June 24, 2009, filed by Hummer and Peterson as counsel for Unger in the Adversary Proceeding filed by Hummer, Unger and Peterson against Gelbard, in his bankruptcy, by which they unsuccessfully sought to revoke Gelbard's discharge;

55.      The Declaration of Eric Peterson executed on August 3, 2009, filed by Hummer and Peterson as counsel for Unger in Unger's Adversary Proceeding that Hummer, Unger and Peterson filed against Gelbard, in his bankruptcy, by which they unsuccessfully sought to revoke his discharge;

56.      The Request for Judicial Notice filed by Hummer and Unger in Unger's action in Federal Court against Du Boise, in which Unger unsuccessfully sought to recover $1.3 million that he falsely claimed he had loaned to Du Boise, and attached thereto is a true and correct copy of the Declaration of Rosslyn Hummer executed on January 21, 2010, filed by Hummer as counsel for Unger in Unger's Federal Court action against Du Boise;

57.      The Declaration of Eric Peterson executed on January 22, 2010, as filed in Unger's action in Federal Court against Du Boise, in which Unger unsuccessfully sought

to recover $1.3 million that he falsely claimed he had loaned to Du Boise;

58.       The Order Closing Adversary Proceeding dated March 7, 2010, brought by Unger, by which he unsuccessfully sought to revoke Gelbard's discharge;

59.       Receipts, Invoices and other documents showing   monies spent for construction work at the Horse Ranch between 2005 and 2008;

60.       Check dated April 15, 2005, made payable to Olyer & Dolman, in the amount of $17,500, representing Gelbard's legal fees incurred in his divorce;

61.       Copies of photographs taken in 2006, showing the construction work in progress on the plumbing and sewer lines at the Ranch;

62.       Copies of seven pre-authorized debits from the account in the name of Ms. Du Boise, for Southern California Edison, totaling nearly $7,000, in 2006;

63.       Copies of multiple checks to The Gas Company, Las Virgenes Municipal Water, and Rock 'n Roll-off, for more than $5,600, for gas, water and trash removal, in 2006 and 2007;

64.       Copies of photographs of the personal property, legal files and evidence belonging to Du Boise and Gelbard, that were taken from their residence at the time of their unlawful eviction from the Horse Ranch in October of 2008;

65.       A video of the Horse Ranch taken on April 13, 2005;

66.       Photographs of the Ranch before and during the construction work from 2005 to 2008;

67.       Photographs of the Ranch during construction in 2007 and 2008;

68.       The Declaration of Unger in Support of his Motion for Partial Summary

Judgment filed in December 2009, in *Unger v. Du Boise*;

69.        The Declaration of Unger in support of his motion for entry of default against Du Boise dated October 20, 2008, filed in *Unger v. Du Boise*;

70.        The Declaration of Unger in support of his Motion for Summary Judgment in the Unlawful Detainer case against Gelbard and Ms. Du Boise, dated June 20, 2008;

71.        The Statement of Damages submitted by Unger in support of his Motion for Entry of Default and a Default Judgment, filed in *Unger v. Du Boise*;

72.        Checks from Unger's alter ego entity, Manatee Design, to Ms. Du Boise;

73.        Check for $20,000 from ABI to Ms. Du Boise;

74.        Gelbard hand-written notes detailing construction costs for the Horse Ranch, believed to have been written in 2006;

75.        Collection of withdrawal slips from the account in the name of Ms. Du Boise, from 2005 to 2007, for cash;

76.        Collection of checks from the account in the name of Ms. Du Boise, from 2005 to 2007, for cash, used for employee payroll at the Horse Ranch;

77.        Collection of checks for labor and materials from the account in the name of Ms. Du Boise, in 2005, 2006 and 2007, used to repair and maintain the Horse Ranch;

78.        Collection of checks from the account in the name of Ms. Du Boise, to her brother, Jack Du Boise, for the sprinklers installed at the Horse Ranch;

79.        Collection of checks from the account in the name of Ms. Du Boise, to various attorneys for Gelbard;

80.        Check from the account in the name of Ms. Du Boise, to Wells Fargo for

Craig Merrick;

81.         Two checks, $1,000 each, from the account in the name of Ms. Du Boise, to Gelbard;

82.         Deposits into the account in the name of Ms. Du Boise, from Regal and from David Kekich;

83.         Notice of Withdrawal of Lis Pendens, dated October 9, 2007, filed in the USAT Action;

84.         Cover letter from Amy Goldman in Gelbard's bankruptcy, with accounting documents, dated November 6, 2009;

85.         ABI Ledgers showing amounts advanced to Gelbard;

86.         ABI Ledgers showing amounts for construction at the Horse Ranch;

87.         Photographs of demolition of the interior of the Horse Ranch by Unger or at his direction, in 2008;

88.         Notice of Violation issued in or about December 2008, for Unger's Demolition at the Horse Ranch, without permits;

89.         Bank Statements for the ABI Construction account;

90.         ABI Ledgers showing amounts advanced to Gelbard, Second Version;

91.         Order Dismissing Gelbard's bankruptcy, entered on January 8, 2010;

92.         Letter from Howard Bernstein to Kenneth Weinstock, dated May 4, 2007, regarding ABI's offer to purchase Gelbard's interest in ABI;

93.         Letter from Aaron Grunfeld, dated September 15, 2010, regarding his expert testimony in this case;

94.        Order Granting Trustee's Motion (1) For Authority to Sell Estate's Ownership Interest in AB Investments, LLC, entered on December 11, 2008, in Gelbard's Bankruptcy;

95.        Trustee's Second Motion (1) For Authority to Sell Estate's Ownership Interest in AB Investments, LLC, filed on February 25, 2009, in Gelbard's Bankruptcy;

96.        Notice of Trustee's Second Motion (1) For Authority to Sell Estate's Ownership Interest in AB Investments, LLC, filed on February 25, 2009, in Gelbard's Bankruptcy;

97.        Notice of Sale of Estate Property, filed on February 25, 2009, in Gelbard's Bankruptcy;

98.        Order Approving Trustee's Second Motion (1) For Authority to Sell Estate's Ownership Interest in AB Investments, LLC, filed and entered on April 6, 2009, in Gelbard's Bankruptcy;

99.        Transcript of Hearing on Trustee's Motion For Sale of Property Under Section 363(b) Re: Interest in AB Investments, LLC, held on March 18, 2009, in Gelbard's Bankruptcy;

100.       Statement of Proposed Buyer in Response to Debtor Allen Gelbard's Opposition to the Trustee's Motion For Order Authorizing Sale of Any Remaining Assets After Trustee's Administration, filed on November 2, 2009, in Gelbard's Bankruptcy;

101.       Declaration of Forensic Accountant Coral M. Hansen in Support of Debtor's Request for the Trustee to Abandon the Remaining Claims and Assets to the Debtor, filed on December 1, 2009, in Gelbard's Bankruptcy;

102.        Police Report dated December 2, 2008, for "Suspicious Circumstances Grand Theft;" and

One-page document entitled "Identified Beaton USAT Transfers 1998 and 1999," showing $27,646,367 owed to Gelbard by Beaton.

## 8.  DISCOVERY

Discovery has been completed.

## 9.  SPECIAL ISSUES

None.

## 10. SETTLEMENT

a.      This case has not had a settlement conference.  A settlement conference was scheduled and subsequently vacated on the Court's own motion.

b.      Not applicable.

c.      ABI has made one offer of settlement.

d.      The parties do not intend to hold future settlement conferences.

e.      It appears from the discussion by all counsel and any pro se party that there is no possibility of settlement.

f.      The date of the next settlement conference before the magistrate judge or other alternative dispute resolution method has not been set.

g.      Counsel for the parties and any pro se party considered ADR in accordance with D.C.COLO.LCivR.16.6.

## 11. OFFER OF JUDGMENT

Counsel and any pro se party acknowledge familiarity with the provision of rule 68 (Offer of Judgment) of the Federal Rules of Civil Procedure. Counsel have discussed it with the clients against whom claims are made in this case.

## 12. EFFECT OF FINAL PRETRIAL ORDER

Hereafter, this Final Pretrial Order will control the subsequent course of this action and the trial, and may not be amended except by consent of the parties and approval by the court or by order of the court to prevent manifest injustice.  The pleadings will be deemed merged herein. This Final Pretrial Order supersedes the Scheduling Order. In the event of ambiguity in any provision of this Final Pretrial Order, reference may be made to the record of the pretrial conference to the extent reported by stenographic notes and to the pleadings.

## 13. TRIAL AND ESTIMATED TRIAL TIME; FURTHER TRIAL PREPARATION PROCEEDINGS

1.      ABI requests a trial to the Court.  Gelbard requests a jury trial.

2.      ABI estimates 1 day for its primary case, not including rebuttal.

3.      Gelbard estimates that trial will take ten court days, not including jury voir dire and impanelment and jury deliberations.

4.      United States Courthouse A442, Courtroom A442.

5.      Other orders pertinent to the trial proceedings: None.

DATED this _____ day of _____, 2011.

BY THE COURT:

_____
United States Magistrate Judge

APPROVED:

DATE:  November 10, 2011          DION-KINDEM & CROCKETT

                                 */s/ William E. Crockett*
                              By:_____
                                 WILLIAM E. CROCKETT
                                 STEVEN R. SKIRVIN
                                 21271 Burbank Blvd., Suite 100
                                 Woodland Hills, CA 91367
                                 Tel.: 818.883.4400; Fax: 818.676.0246
                                 wec@dkclaw.com
                                 srs@dkclaw.com
                                 **Attorneys for Plaintiff**
                                 **AB Investments, LLC**

Date:_____          _____
                                 Allen W. Gelbard
                                 Pro Se
                                 28236 Dorothy Drive, Unit B
                                 Agoura Hills, CA 91301
                                 Email: LISADUBOISE@aol.com